LabMD versus the FTC. LabMD versus the FTC. Mr. Beall. Good morning, Your Honors. May it please the Court, Douglas Beall on behalf of Petitioner LabMD. We have raised in our petition and in our briefs a number of arguments that we believe call for this Court to vacate the FTC's order here. Can't begin to address all of them in my remarks today, but I do want to try and address three particular issues. First, why this Court should not accept the FTC's interpretation that the purely conceptual privacy harm that the FTC found to exist whenever there is any unauthorized access to any personal medical information constitutes substantial injury within the meaning of Section 5N of the FTC Act. Second, why this Court should not accept the FTC's interpretation that likely injury for purposes of Section 5N includes low likelihood harm where there is a significant risk of the injury and the injury would be large. In each of those cases, our argument, the gist of it is, that the plain language of substantial and the plain language of likely prohibit those interpretations as being unreasonable. Third, I'd like to address the fair notice issue, namely why if this Court accepts either of those interpretations of Section 5 or any of the interpretations of Section 5 that are on the issue here, why this Court, if it does so, and it does so upon giving Chevron deference to those interpretations, why this Court should find that LabMD did not have constitutionally sufficient fair notice of those interpretations because it did not have and was never provided ascertainable certainty. That's a lot of territory to cover in eight minutes. Let me ask you this question. Aren't we pretty much limited, our standard of review is pretty much limited to determining whether or not there's substantial evidence to support the Commission's determination that the company's cybersecurity measures in 2005 were insufficient or unfair to the extent that they caused or were likely to cause harm to consumers? So unless, when we look at this record, and this is the language that we've used in our prior cases, unless the record compels a contrary conclusion, we have to affirm the FTC's determination. I would disagree with that respectfully, Your Honor. And the reason I would is that the FTC's opinion here is based not just on factual findings but on test after test after test that is a legal test over which you have plenary review subject to Chevron deference. And if you find, and we believe it's compelling that this Court should find, that the FTC used the wrong test to assess that evidence. You don't really get to Chevron deference, is that it? In other words, you first determine whether or not, as a matter of law, there were substantial injury and likely to cause harm were used legally correctly or not. Yes, exactly. We feel that Chevron deference would never be afforded here, should not be afforded here, because you don't get past Chevron step one. You look under this Court's precedent, case after case, you look first to the plain meaning of the statute in the context of substantial. That was a term of art at the time that Section 5N was enacted. You had the 1980 opinion by the FTC, and then the 94 statute was enacted. Now, what happened between 80 and 94 is in that gap. Is there something to suggest that the FTC followed its policy statement of 1980? There is something to suggest that. In the Senate report, which we've referred to in our brief. I know, other than the FTC itself. So, in the Senate report, Congress said, you know, up till now, the FTC has been sticking with the policy statement, but what did the Senate then say? It said, to prevent a future FTC from abandoning the principles of the policy statement and the policy letter, that's why we're enacting Section 5N. It was intended to be prophylactic, to lock in, to lock in the interpretation of substantial that the FTC had announced in the policy statement and the policy letter. Now, what was that interpretation? Very clear. First of all, FTC was very clear in saying, tangible injury could be substantial. In the policy statement. In most cases, substantial injury involves monetary harm. Tangible injury. Well, what do you think of this category called concrete injury? Well, in the policy statement, the FTC uses the word concrete in the context of explaining what substantial injury is. The FTC was not using the word concrete in the policy statement to refer to Article 3 standing principles. There's no possible way to read the policy statement as having intended to use concrete in that fashion. I recognize that the FTC in its brief has now latched on to concrete and that word in the policy statement and saying, well, we meant Article 3 standing. But it's clear that the FTC did not mean Article 3 standing as substantial injury. Here's why. All kinds of harms that would create Article 3 standing are expressly excluded from substantial in the policy statement. For example, tangible harm is excluded as being substantial unless, if it's a small amount of harm, a large number of people are affected by it. That's right in footnote 16 in the policy statement. Well, tangible harm doesn't have to affect a large number of people to create Article 3 standing. This court has held repeatedly that an identifiable trifle. Different inquiries. There are different inquiries. Absolutely different inquiries. Absolutely. And so you can't read the policy statement as setting a standard that Article 3 standing type of injury is sufficient to be substantial injury because of all of the Article 3 standing creating injuries that the policy statement expressly excludes. Emotional distress expressly excluded from the substantial category by the policy statement. Emotional distress is a legally cognizable injury. So if the test was concrete in the Article 3 sense, it wouldn't have excluded emotional distress. So it can't be the test. What the policy statement says, and what Congress said, FTC, you're locked into here, is that the injury can be tangible to be substantial but cannot be a subjective injury. Subjective injuries are expressly excluded by the policy statement and Congress expressly excluded them in Section 5N. That was the congressional intent. And what the FTC is basically saying here to this court is, hey, that was then. This is now. Privacy is important. Data security is important. And we should be able now to read substantial to include a subjective injury like this even though the policy statement said we wouldn't. With respect, I think the answer to that statement today is the same answer this court gave to the FTC 38 years ago in the U.S. Life decision. The answer is, if you want to change the meaning of substantial, you can't come to us to do it. You can't do it. You've got to go to Congress. That's what Congress said when it enacted Section 5N. On the issue of likely, could you distinguish Wyndham for us? Wyndham, actually, we believe, in every respect, supports our position. Wyndham, for example, on ascertainable certainty, says that if the FTC is going to get Chevron deference for one of its interpretations of Section 5, Wyndham holds, the Third Circuit held, the FTC has to have given ascertainable certainty to the defendant prior to the conduct in question. So here, under Wyndham, I want to embrace it. Under Wyndham, the test is, if you're going to defer under Chevron to any of these new interpretations that are being advanced for the first time in this case, the FTC has to show that it gave LabMD ascertainable certainty of substantial means subjective, likely means unlikely, is means was. All of these new interpretations, where's the ascertainable certainty back in 2007? The FTC doesn't even argue that it provided ascertainable certainty. It says, well, we didn't have to. We didn't have to. Because all we do is enter mere cease and desist orders. And where there's a mere cease and desist orders are enforced by the district court's coercive injunctive power. Exactly. If they cease and desist, you don't cease and desist, and now the district court is brought into the role to supervise. And they're predicated on a finding of violation of law, and they carry with them penalty exposure that the law itself does not carry. Cease and desist orders aren't just innocuous items. They're things that are really burdensome, really difficult for companies to comply with. And here... This is more of an enforcement order than a cease and desist order, right? It is... First, actually, there's no provision in the order that even calls for us to cease and desist doing anything. It's all entirely... It's all mandatory. It's all mandatory injunctive relief, including all kinds of compliance costs. In which event, if they don't do it as a show cause, they can bring a suit in the federal district court. And get penalties of $40,000 a day for each day of noncompliance. To say that that's not an order that is grave enough and drastic enough to trigger the ascertainable certainty requirement, it doesn't accord with any of the case law. The D.C. Circuit decision in GE, which the FTC actually embraces, specifically said that where you've got a finding of a violation of law, which you have here, and compliance costs of there, I think it was $25,000... Counsel? Sir? Lab MD is out of business, right? Correct. Okay. And so, why isn't this case moot? It's not moot because the order, if it's allowed to stand, would impose substantial costs on Lab MD. So it's not moot for that reason. Well, he can if he's out of business. Well, Lab MD is still... It's not operating, but it still is an existing company. It's still subject to the order. Can it start up again and do business like it was doing before? The record is, as was put in in the context of the stay motion here, that there's no reasonable prospect of at this juncture, after everything that's happened to the company, of it being able to resume business. So... Isn't this really a likely-to-repetition issue? It may be moot to the extent that it's likely to repeat and affect other parties. Is that what you really hear on behalf of the amicus and others who are interested in dealing with this issue, not really the parties? We're here because the order will have significant practical, real impact on Lab MD to the extent it survives. It does survive. It is a surviving company. It's here today presenting its case. And we're here absolutely... I thought you said he was out of business. It's not operating, but it is still an existing corporation, an existing company. It still has in its possession, as it's required to by law, patient information. It has it under lock and key, and there's no issue about whether it's protected. So it's still complying with Georgia law in that regard. But we also are here, yes. We're here because what happened here shouldn't have happened here. And... It may happen in the future. It may happen in the future to other companies. And yes, there is absolutely... I'm not going to walk away from it one bit. There is a matter of principle that is very important to Lab MD in this case. Absolutely. That is part of why we're here, for sure. We understand that. You've saved your butt. Okay.  Mr. Hoffman. May it please the court. Let me address the first issue that Mr. Meehl spoke about, which is the... I believe he harmed a substantial injury. What the commission determined here was that unauthorized disclosure of sensitive health or medical information, and it's limited to that category, by itself constitutes substantial injury, even if it doesn't cause any economic or physical harm. And that's fully consistent with well-established principles of privacy law, which this court recognized just last month in Perry versus CNN. And there's nothing to the contrary in either the unfairness statement or Section 5N itself, or the legislative history. What the commission effectively said here is that for substantial health and medical information, and we're talking here about very sensitive things, you're the owner of that information. You're the owner of your own sensitive health and medical information. You have a right to decide whether and how it should be disclosed. And if that information is disclosed to someone without your consent, you've been injured by the loss of that right. That's consistent with a very large body of case law. I mentioned the Perry decision, which, again, noted that unlawful disclosure of legally protected information is a clear de facto injury. It cited the restatement of torts, which we've cited in our brief as well, and the commission cited, noting that in the case of intrusion upon seclusion, the intrusion itself makes the defendant subject to liability. But what happens if the – I think most of the cases that you cited were cases that were brought by individuals who knew about the information and, therefore, might have had emotional or subjective injury. But this is a case which involves a tree fell and nobody heard it. That's the kind of case that we have here. Isn't that distinguishable from all the lines of cases? And you can bring these cases if you have some tangible injury. Isn't that really the issue here, not whether or not privacy is a good thing? We all agree to that. Well, certainly LabMD has framed it as a question of whether there's a tangible injury. There is nothing in the unfairness statement or the legislative history that limits substantial injury to tangible injury. And, in fact, the FTC, subsequent to the unfairness statement, you had asked what happened between 1980 and 1994. A couple things happened. The FTC decided several cases, including the International Harvester case, the Orkin case, which was affirmed by this court, where the commission did, in fact, rely on intangible injury as a type of harm. The commission has also found other types of intangible injury to be the basis for unfairness in other cases. All of that was part of the background that Congress had before it when it enacted Section 5N, and it expressly said in the legislative history that we intend for the court, we intend that the commission will continue to interpret this in the same way that it's been interpreted by the commission and the courts before. So, again, there's nothing in the statute itself or the legislative history that talks about intangible injury being off limits. Now, it does talk about, in most cases, emotional or subjective injury would not be the basis for a finding of substantial injury. But, of course, we don't have a subjective or emotional injury here. As you point out, we have people who don't even know that they've been injured. That doesn't mean, however, that the injury hasn't occurred. Subjective means that it turns on the mental state of the victim. In this case, it can't turn on the mental state of the victim because the victims don't even know that they've suffered an injury. So, for that reason, what we have here is an objective injury. Again, it's analogous in some ways to a trespass. You know, if someone trespasses on your land, you may not know about it. It may not actually cause any economic damage to the land. But, nonetheless, you've been injured and you have a right of damages. And the restatement… But what damages would you prove? In other words, to have a complete tort, you have to have damages. So somebody steps over the line and jumps back out. Is that a compensable trespass? I believe it would be under the law of trespass. But I certainly know that… You want to go that far? But I certainly know that under the law of privacy… You want to go that far that somebody stepped over the line and stepped back? Well, I… For punitive damages. I want to go… Under the law of torts, it's punitive damages. I want to go to the law of privacy. And the law of privacy is very clear in the case of a privacy tort. Even if you can't prove emotional harm or special damages, which would be economic harm, that you're still entitled to nominal damages. So in the privacy context, that would be the case. I can't speak to the law of trespass in that respect. So the answer is do I want to go that far? No. You don't want to borrow tort law in this area, don't you? It's important to recognize we are not… The commission is not enforcing tort law. Tort law doesn't occur here. This is right. The commission, whether it's actionable or not… No, no. You agree that nobody out there has a lawsuit as far as you know. Nobody out there has a lawsuit as far as I know. As far as we know. For anything. The people who are injured here don't know they've been injured. I understand. So nobody has a lawsuit for anything as far as you know. As far as I know, no. Okay. And as I said, the commission is not here enforcing common law torts. The commission is, however, looking to common law principles to help define substantial injury. And in the case of privacy torts, it's very clear that an invasion of privacy is by itself actionable. Is there any outer limit to this approach? Is there anything that would be beyond the power of the commission to reach? Can they just go roaming around the economy and picking up industries and setting up these new rules? That's what I'm missing here. I thought the 94 statute attempted to cabin in the discretion of the commission. The 94 law does, as Mr. Meehl said, it does. You're just looking for prophylactic measures. Isn't that what we've got here? These are prophylactic measures. Everything's prophylactic. Everything here is prophylactic, yes. You could go to any company, any place where there's any privacy information and lay it out there because there's a potential for injury. Well, the commission's holding here on privacy isn't limited, is limited. You were given the names of a list of people who've, where information has gotten into the atmosphere, as it were, by the party that was helping you out. It didn't give you the name of their own clients who have violated the law, basically, and needed prophylactic measures but gave you other ones like this one. You're talking about what happened in this case? Yeah. In this case, the FTC received information from a third party which had obtained the information. Why wouldn't you go through rulemaking if what you want to do is a prophylactic measure of future conduct? Well, the commission has determined that in areas of privacy. That's basically what I see in this case is rulemaking. The commission's determined that in the case of data security and privacy, that rulemaking really isn't an effective way to proceed for a number of reasons. There's just too many varieties. Too many varieties, too many things can happen. Too many things can happen, and standards are always changing. Well, but the problem, the reason for rulemaking is there's no notice for any of these things in the past, so that's why you use rulemaking. You're going to set prophylactic rules in the future. Nobody knows they've been violating anything. We're going to create something, and you will violate if you violate. Right. I agree that that's one reason why an agency might use prophylactic rulemaking. Of course, the Supreme Court made very clear in Bell Aerospace and in the Chainery case that the agency is entitled to proceed on a case-by-case adjudication, particularly in situations like this where it's difficult to formulate ex-ante rules. And the rule that the commission has set forth here, and, again, we're not seeking shemmer and deference after this. This is clear from the language of the statute, and Wyndham made it clear, is that companies have a duty to act reasonably under the circumstances. That's not, you know, that. That's about as nebulous as you can get unless you get industry standards. Well, there are industry standards. You lay them out, and then you have these industry standards, and say you're not complying with any of these standards, but I don't see any industry standards here. There certainly were industry standards, and the commission referred to them in its opinion, and referred to, for example, the NIST standards. They're standards issued by CMS. In the case of entities like LabMD, they're in the medical space. There's also HIPAA. So all of those things are designed to help companies determine what's reasonable under the circumstances. Is there any concern on the part of the government how this information was imparted to the FTC? This company, Traversa, doesn't come in here with clean hands, does it? Well, certainly Traversa has engaged in some misconduct in connection with the ---- Was there collusion between Traversa and the government? No. Counsel, let me put it this way. What the aroma that comes out of the investigation in this case is that Traversa was shaking down private industry with the help of the FTC, with the threat of going to the FTC. If you don't cooperate, we will go to the FTC. It may well be how they got some of their clients, but that's an aroma with falsifications to the commission.  Just totally annihilated it. I'm sorry. I mean, what's the question? Just an observation. So, I mean, my observation is that Traversa's conduct is not really what's at issue here. I mean, there's no question that Traversa engaged in serious, serious misconduct in connection with ---- And got the commission involved in their shakedowns. I don't agree with that. Oh, counsel, come on. I don't agree with that. Oh, I know you can't agree with it. But it should have become obvious after the evidence collapsed. And complaint counsel couldn't go any further. Well, again, the ---- It has nothing to do with whether or not the commission has ---- You're addressing what happened at the hearing, and the commission agrees ---- It has nothing to do with whether the commission has mass supplied the law in its opinion by that. Correct. That's the question. Again, what we're here to discuss really is LabMD's conduct. And there's no question here that LabMD didn't engage in basic, inexpensive safety procedures to safeguard the very confidential information that it had. So how would they have had noticed back in 2005 that their data security measures were insufficient to comply with the standards that the FTC expected? How would they have had noticed back then? Again, they certainly had noticed that they were required to use reasonable data security measures. That's the same standard that applies in a wide variety of contexts. And businesses understand what it means to act reasonably under the circumstances. Because their billing manager used a file-to-file sharing program that everybody used back then, and no one understood back then could have caused these types of security breaches. And if that's the case, it seems I'm hard-pressed to determine how they could have had fair notice that they violated section ---- Well, the answer is it was well known in the industry back then, and there's evidence of this in the record. And as you pointed out, this is substantial evidence review. I would refer you to Dr. Shield's expert report that peer-to-peer file sharing was a serious safety data security risk. And that's something that a reasonable business would have known. Now, what did LabMD do here? We have a couple things that they did wrong that contributed directly to this injury. Number one, they gave employees administrative rights over their computers, which allowed them to install software. Would it have cost nothing to turn that feature off and limit that? But they did, and that's how LimeWare got installed. They trusted their employees. And they ---- Just like we trust employees not to use the computers for pornographic purposes, and I suspect the same with your employees. Well, I would bet that your employees ---- There's a lot of trust out there. I would bet that your employees can't install their own software. When they breach the trust, we start clamping down. I would bet that your employees can't install their own software on government computers, and further, there was no training. Let me ask you this question. Let's assume that all of the data security measures that were ordered by the FTC had been implemented when this billing manager used this file sharing program. But she did it anyway. Would there have been a violation of the statute? You're saying that all the things that the FTC said they didn't do were done? And she did it anyway. She just, you know ---- Well, she couldn't have done it if they had done all these things. So, in other words, I mean, if she didn't have administrative rights, she couldn't have done it. So I'm not sure I understand that question. Certainly, if it allowed them to engage in this conduct, the fact that a breach occurred would not result in an unfair practice. I mean, the commission has been very clear that the fact that a breach occurs isn't what creates unfairness. It has to do with the failure to act reasonably under the circumstances. And, again, I don't think, with all due respect, I don't believe that's a nebulous standard. It's a standard that all businesses comply with as part of ordinary tort law. And, you know, businesses in the 2005 to 2008 timeframe certainly knew that they were required to act reasonably under the circumstances. And LabMD, LabMD knew that. I mean, if you look at LabMD's ---- For every prophylactic measure that is installed, the people who want to do wrong are going to find out a way to get around it. That's an ongoing proposition. Yes, it is. Let me refer you to ---- I mean, that's why you took this case. And you'll take another one. It's a never-ending proposition in terms of information getting out into the public, as it were. Well, it's certainly true. Into the social media and elsewhere. Social media wasn't as much of an issue back then. Well, whichever. But certainly there's an ongoing ---- Constant problem. The commission is very concerned about data security issues and continues to bring these cases. It's a constant problem. Every time you have a stopgap, you're going to have to have a new rule because they'll get around that one. Correct. And the technology is always changing. The commission couldn't, as a practical matter, say you must do X, Y, and Z because it wouldn't apply to every business. And as soon as the commission issued the rule, it would be out of date in six months because the technology is changing. The threats are changing. So it's much more sensible to say you've got to act reasonably. And, again, there may be situations where there are ---- And business industry has got to figure out what the commission means by reasonably. The commission ---- They'll never know what the commission means. Something happens and the commission will say it's unreasonable. Well, let me say, this is not a closed case at all. I mean, this is a case where we have a ---- I'm not talking about this closed case, just the plain unreasonableness test. I think ---- An industry is going to think it's reasonable, and something happens and the commission will say it's unreasonable. In hindsight, you should have done such and such. That happens to business ---- That's the way this is going, this whole problem. That happens to businesses in tort law all the time. People say, I didn't realize this was unreasonable. Well, the things that you need to do to establish that you're acting reasonably are the kind of things that are laid out in the available guidances. There is a difference between tort law and the common law application and a government rule as to what is reasonable and not reasonable. I think that's the essence. The public policy implications, it seems to me, of what you're saying is that a limited license to figure out what is reasonable and unreasonable in the economy. And the commissioners will sit around and decide what is reasonable, and I don't believe that that's a good public policy objective. I believe that's exactly what Congress intended. Every time something happens, which heretofore was thought to be reasonable in the industry, say, all of a sudden becomes unreasonable because in hindsight you realize, well, this could have been avoided. And so we'll have a cease and desist order. The commission doesn't act on terms of hindsight. The commission acted here in terms of what was reasonable at the time. I'm talking about your just plain unreasonable standard. It's certainly true that something that could be reasonable today might not be reasonable tomorrow. That's always the case. Absolutely. All right. Doesn't that underscore the importance or the significance of rulemaking? Otherwise, you're regulating data security on a case-by-case basis, right? We are regulating data security on a case-by-case basis, and that's exactly what the Supreme Court says in Bell Atlantic and Schenery that an agency is entitled to do. And it doesn't matter whether the subject has any notice at all. Correct. Correct. Notice becomes irrelevant. You can adopt new rules in an adjudication. The Supreme Court's made that very clear. I appreciate your concession. So you can adopt new rules in a thing. I mean, this wasn't a new rule. This was an existing rule that was. Notice is not required. Why have rulemaking at all? There are certainly. Why not just have ad hoc litigation cases? You establish case-by-case these new rules. That's typically how the commission works. It does issue some rules and some. You don't have to have rulemaking. We don't have to have rulemaking. We do have rulemakings. You don't do the rulemaking because you can't anticipate the problems until they occur. That's certainly one reason why we don't do rulemaking in this particular instance. So this is a substitute. Yes. And, again, Congress, when Congress created this scheme, they anticipated that the commission would address things on a case-by-case basis and gave the commission great latitude to define what's unfair. And the difference between what you're doing and the tort law is is that the tort freezer already knows, or there's already a standard out there by which to judge. And there is no standard here except unreasonable in retrospect. Well, in general, the tort standard is the duty to act. You have to prove injury, and then the whole analysis is different from what this is. Correct. For example, in a tort case, you have to prove actual injury here. The commission can act based on likelihood. And unreasonable in terms of what was existing at the time, not in terms of hindsight. I would like to point out to the court, again, LabMD certainly knew of its obligation to act reasonably and to implement data security. If you look at their compliance manual, which is Exhibit CX005. LabMD knows it has to do with reason. There's a tort law out there, among other things. Correct. LabMD knows it. They said, We will place policies and procedures in place, in addition to the compliance program, to monitor and ensure that patient information is secure, kept private, and only used for care, billing, or operational uses. That's what they said on paper, but they didn't put into practice what they said on paper. And that's the reason why we're here today. I do want to address briefly the question of the status of LabMD. I think Mr. Meehl initially said they were not in business. To be clear, it continues to exist as a legal entity. It continues to maintain its computers with the data on them. We understand. Okay. In that case, if the Court has no other questions, we would ask that the petition be dismissed and the order reforced. Thank you. Mr. Meehl. Thank you, Your Honors. Let me circle up really immediately on one of the issues alluded to at the end there, where the proposition was, yes, what Congress intended here was that the commissioners would sit around and sort of decide on a case-by-case basis whether it was reasonable or unreasonable, thumbs up, thumbs down. Absolutely not. 5N is clear that that's not what the commission is allowed to do. We didn't get, in my initial remarks, to the cost-benefit test that is embedded right in 5N, that the commission is required to engage in. That's step number two of Chevron, though. That wouldn't be what we're doing here. That would be you wouldn't. We're trying to ascertain the meaning of the words on the statute, so we don't get to cost-benefit analysis, et cetera, on number two. That's your best guess. You get to cost-benefit. I think your point is that you can't do it retrospectively. You can't do it retrospectively, and you can't. Section 5N has its own cost-benefit test, leaving aside the Chevron issue that you're alluding to, Judge Rubino. And you said earlier to me, can you distinguish Wyndham? One of the reasons we embrace Wyndham is that Wyndham enunciated under Section 5N that the commission is obliged to do a cost-benefit test in every case that compares, just as this court said it was a long time ago, just as this court said in American Petroleum, when an agency is required to do a cost-benefit test, leave aside how elaborate it has to be. There's one thing that it has to do. You have to aggregate the costs and aggregate the benefits. That's a cost-benefit test. You can't do a cost-benefit test unless you have that, and you did that. There was no aggregation of the benefit here. There was no aggregation of the harm here. It was just a label. We think the benefit is big. We think the harm is great. We think the cost is low. Industry standards, absolutely right. There was no evidence of industry standards here. In the Silverpop case, this court's decision in Silverpop, why that decision went the way it did is precisely because there was no evidence of industry standards. Industry standards are the linchpin of any kind of reasonableness analysis. That's what this court held in Silverpop. There was no evidence of industry standard here with due respect. There was evidence that some companies do this. Some companies do this. This was a known security measure. This was a known security measure. That's the evidence. That's not an industry standard. That's examples of things that companies do. That doesn't make an industry standard. And no expert, no expert testified to any industry standard that was in place here or was violated here. And remember, when we're talking about industry standards here, we're talking about the industry standard that would be applicable to a tiny medical testing facility like LabMD. Not all the health care entities in the world. Clearly the standards vary depending on the size of the company and the information it's protecting. No evidence of anything like that. Rulemaking. We can't do rulemaking, the FTC says. It just doesn't work in data security. What about HIPAA? The HIPAA security rule is an elaborate rulemaking that HHS did under HIPAA. It's not impossible. It's been done. What about GLBA and the rulemaking under GLBA? Same thing. What about all the industry standards and the rules that are out there on payment card security? It's not impossible. They're just saying that. In terms of is this injury subjective? Of course it's subjective. Go to page 7 of the FTC's brief where they say why this is an injury. Why is it an injury? Many patients would want the data protected. Opinion of the FTC, page 17. Why is this an injury? Many people would be offended if their information got into the wrong hands. Offended? What people want? What people expect? That's all subjective. This is the epitome of a subjective injury. And the FTC did not say ordinarily subjective injuries don't rise to the level of substantial. That's not what the FTC said in the policy statement and the policy letter. They never rise to the level of substantial on their own. That's what the FTC said in the policy letter. It wasn't a usually and ordinarily. It was an absolute flat blanket statement. Subjective injuries will not be treated as substantial in and of themselves. The FTC today wants to change that. And what this court said in the U.S. Life case I mentioned earlier is if you want to change it, don't come to us. Don't do it yourself. Go to Congress. And that is particularly appropriate here where Congress said when it enacted 5N, we are enacting this to prevent you from abandoning what you said in the policy statement. So against that background, for the FTC to say, well, because data security is really important because we really care about it and we've got three commissioners on the commission who think it's really, really important, we should be able to change the definition. That's not the way it works. So happy to answer any other questions that any of your honors has. I think we understand your case. Thank you, Your Honor. We'll be in recess for 15 minutes.